, case number 242723. Good morning, Your Honors. May it please the Court. I'm going to turn it over to Mr. Shavon Atkins from the Federal Defenders of New York for Appellant Lenny Reyes. Good morning. Good morning. The First Degree Attempted Murder Guideline is intended for the most serious of already serious cases. When applied to felon and possession cases like this one, it can make a defendant's sentence many multiples of what it otherwise would have been. Yet the government continues to seek and courts continue to apply the guideline in shootings where the intent to kill, as opposed to the intent to scare or the intent to harm, is unclear at best and where a defendant was likely guilty only of attempted manslaughter or reckless endangerment. That's what happened here. Mr. Reyes, furious and heartbroken after encountering those responsible for his brother's death for the first time, shot once at a group of men and, crucially, did not shoot again despite having the opportunity to do so. This court should therefore vacate Mr. Reyes's sentence and remand for resentencing. So your view is, as I understand it, first in terms of the review, that we should review this largely on a de novo basis because there's a video, well, actually videos that are undisputed. Does de novo review also apply to the first videos with respect to Mr. Reyes's interview by law enforcement? Yes, that's correct. I mean, the facts as to what was said, Mr. Reyes's demeanor, none of that is disputed. All of it is about the legal significance of what he said, namely whether it shows that he ultimately had the intent to kill and whether or not he, in fact, acted with malice. What's a little odd is that, well, maybe not so odd, but what's puzzling is that a district court judge saw the videos, there's no dispute about that, and came to a different conclusion. That is, came to a different view of the video. So if, for example, there were a disagreement among us, wouldn't it be reasonable to defer to the district court judge at some level? Understanding, you know, there's de novo, all these things, all these concepts are somewhat fluid. I don't think it's reasonable to defer to the district judge because this court is just as prepared as the district court judge to view the videos for itself. So, you know, it's not a situation where a district court judge is making credibility findings. It's not a situation where the district court judge is reviewing testimony. It's not a case where the district court judge is using its expertise as the trier of facts to make disputed determinations about credibility. And so what is the legal error? So the legal error here is applying the attempted murder guideline where Mr. Reyes did not have the intent to kill and did not act with malice. So it's a clear, I mean, again, the... That sounds like, just, I think it's following up on Judge Larry's question, but isn't that a question of fact? What mens rea someone had in their mind at a particular time, that's a factual determination, correct? Well, so I think it's no different from... No, no, just, you can get to the explanation, but just... I think it's a finding of fact in service of a legal question, which is, yeah. Sure, we don't bother finding facts unless they serve a legal determination. I mean, otherwise there would be irrelevant findings of fact. So let's just park for a second on that. So if it's a factual determination, that means that there's a corpus of facts, videos, statements by your client, whatever. And then there's factual inferences drawn from them, right? But we call them factual inferences, not legal inferences that must be drawn, but they're ones that a fact finder, say a jury could find in a... If this were a, let's say it was a trial for attempted murder, we would say that the jury can make factual inferences about what was in the person's mind, right? Yeah, so I just wanted to... Why are we not in the world of factual inferences? Well, so maybe one analogy is better, which is, you know, this court does review facts in service of ultimate legal questions. So for example, sufficiency review, right? This could be analogized to sufficiency review, where this court is looking at facts, but in service of an ultimate legal question, whether or not the evidence was sufficient to show, for example, here intent, right? And that is a determination that this court conducts de novo, and that's what we're asking for here. But when we do that, we draw factual inferences in favor of the conclusion reached by the fact finder. Yes. So if it were sufficient to the evidence after the trial, we would say in support of whatever verdict the jury came to. So I guess what I'm wondering too is, I understand your, I think, underlying point about the video, which is, well, you should do it de novo because you are as in a good position as the district court to watch the video, and I agree with that. But that seems to me that that would argue in favor of just keeping the same clear error review and saying, well, if the judge looked at that video and said, well, clearly the defendant was hiding behind a fire hydrant, we'd say, well, that's clearly erroneous because I can see the video and there's no fire hydrant. But that wouldn't take in favor of de novo review, it would just say it's easier to find clear error because we've got the video in front of us. But then when you have other things like factual inferences, well, then we don't have the factual inference in front of us. That is something that we ask the fact finder to do as a plus on top of the video. And then clear error winds up being a deferential, more deferential standard. Does that make sense? Right, right. No, no, I certainly see what Your Honor is saying. And we certainly wouldn't fight the premise that it would be easier to find clear error here. You know, I mean, I, I, but at the same time, I do think de novo review is appropriate because of all the re, all of the reasons for applying deference in the situation where there is a video that Your Honors can see with their own eyes, all of the reasons for applying deference are absent. This Court is just as well positioned to, to draw those, to, to both find facts and draw inferences based on common sense behavior. Your argument is that you prevail even under clear review. That's correct. In part because there's no indication in the video, for example, and the, the district court did not find that the gun malfunctioned. So we're, and there's, as I understand it, at least a concession or an acknowledgment by the government that he was, that Mr. Reyes was provoked by grief. Yes. Experiencing some level of grief at the time that he saw the people who murdered his brother the second time.  Can you, can you take us through the clear error process? Yeah. Yeah. No, absolutely. So, and it's a little, a little bit complicated based on the record because as we've noted in our briefs, the district court declined to find at the beginning of the hearing that the gun malfunctioned. Right? The government seemed to acknowledge that where Mr. Reyes shot once, where a still from the video shows Mr. Reyes with his, after, after shooting once and missing with his gun pointed at the purported target, but he specifically declined to shoot again. Hang on a second. It shows that he didn't shoot again. You just added a fact that the district court did not find. Yes. You just added the fact that he declined to do so. The district court, let's do a step at a time, district court did not find that he declined to do so. Correct? That's correct. Yes. Okay. The district court, you also said previously that your client had an opportunity to shoot. Yes. I assume baked into that statement, you're asserting that he was not only standing in a position to shoot, but that the gun was capable of shooting. I assume both of those are what you mean by opportunity. Well, I mean, I just like to remind that it was not our burden below to show that Mr. No, no, no.  Yes. You're just breaking it down. Yeah. Yeah. Yeah. Yeah. And again, the district court never found the contrary that the gun was functional or that there was another bullet in the chamber or anything like that. Well, so the district court rejected the government's only purported basis for why Mr. Reyes did not shoot again. Right. So, yeah. And taking away, and I understand Your Honor's point. We're left with sort of an empty, like an empty set, like we're left with no finding about why there was no shot there. Right. Because it seems to me that you're arguing that because the district court rejected the government's proper explanation, that somehow the district court implicitly endorsed your explanation. But my reading is that the district court said, I'm not making any findings about why, whether, what was going on, because I only care about the first shot and that because it was torso level, that's enough. Well, I think even taking away, even, you know, accepting Your Honor's, you know, characterization of the record, even with that, there's still legal error because the district court has not addressed, you know, it is the government's burden and it was the district court's onus to provide specific factual findings about that Mr. Reyes was, his killing was malicious. But the district court did.  The district court found that him running up to the car and shooting at the victim from close range was sufficient and then chasing him. We don't know whether the gun actually jammed. When you watch the video, he certainly looks at the gun, he pauses and looks at the gun. I suspect that's why the government was trying to argue that inference, but leave that aside. The court found, and there's case law, U.S. versus Reed, that shooting someone at someone at close range is a factual basis for inferring intent to kill. Why is that an error? So Reed is distinguishable. The government has not pointed to a single case in which a defendant, while shooting once and not shooting again, is sufficient to find intent to kill. Because I think Reed is actually an illustrative of the point in that the district court there specifically found that the victim got away, that all of the actions of the defendant showed. But there was one shooting and the victim was chased. Yes. And the district court then specifically found, which is not the case here, and, you know, I could walk you through, you know, the record to show that the district court had seemingly basically overruled its previous decision when it said that Mr. Reyes attempted to shoot again. So I think, again, the district court did not address the fact that Mr. Reyes had the opportunity to shoot again, judging by the stills of the video, the video itself, and did not shoot again. It was incumbent on the district court to address that fact in deciding whether or not Mr. Reyes had the intent to kill, because not a single fact. Why if the court found, based on looking at the video, that the way he approached the video, the circumstances of the case, he knew they were out there, he retreated to get a gun to approach them, based on the totality of the circumstances and what the court knew of the facts of this case, and then watching the video, why was that error for the court to infer intent from that initial shot? Well, so a few things. We certainly, again, we do not dispute that Mr. Reyes was there to do harm. So when it comes to preparing himself, when it comes to all of those, you know, when it comes to his motive, we don't dispute that he was there to attempt harm, but the question here is not whether he was intending to commit harm. The question was whether he was entitled, whether the government was entitled to the attempted first-degree guideline, which is the most serious of an already serious crime. And so— That takes two elements, intent to kill and malice. Yes, exactly. So would you— Yes. —understand— Yeah. —your answer to the question about intent to kill, would you turn to malice and this idea of provocation and tell us why we should assign error to that determination? Yes, absolutely. So, you know, the case law is clear that, and this is in Sands, that a defendant can be provoked not just by, for example, the initial encounter or the initial news, which here would be hearing that the men responsible for his brother's murder were down the block, but also that a defendant's passions can be reignited. So, for example, when a defendant then sees the people responsible for his brother's killing for the first time. So we don't dispute that after— Even when he seeks them out? Yes. I mean, I understand if he just stayed put and they came to him, but he arms himself and goes to, you know, to the area. You know, in the—this is not a self-defense, but in the context of self-defense, this wouldn't work because you can't approach people, confront them and say, well, I did that in self-defense. Well, I think the analogy is helpful, Your Honor, because there is no requirement in the law that a provocation be because of—that a defendant be entirely blameless when encountering a provocation. The question is just whether that defendant was acting from heat of passion rather than cool-headed deliberation. What was the error, though, that you would ask us to assign to the district court's determination that he acted with malice? Yeah. So all the district court found with respect to malice was referred to basically the initial provocation of his brother dying. So the district court said far—and I'm paraphrasing—but far from acting in the heat of passion, it was a full 11 days between the time the defendant's brother was murdered and the time of the shooting. So the error that you would ask us to assign is that it failed to appreciate or understand or find that the provocation might have been rekindled when he saw the perpetrators again. That's exactly right, Your Honor. And, you know, it's sort of akin to—there's this Court's case in Lagros where this Court—and I can certainly provide the citations, 529 F. 3rd 470—where this Court discusses how, you know, at the very least the district court's to ensure that the district court considered—and it, I think, applies with particular force here when it comes to the attempted first-degree murder guideline, which, again, is a very serious—the most serious of an already serious set of guidelines. Just a second question, and I'll—  Unless my colleagues have got any further questions now, we'll hear from the  So the government says that it does not dispute that Reyes's grief drove him to act. Yes. But Reyes did not act in a fit of rage. Can you help me distinguish, with respect to understanding what—or unpacking what malice means, between grief and rage? Between grief and rage? Because it seems to be— Yeah. The government seems to make a material— No, we certainly—yeah, I don't see how that helps the government because a defendant can act from rage and still not have malice. I mean, that's the very point of the, you know, what we call in State law, extreme emotional disturbance. What, you know—all that means is that a defendant is acting rashly and from, again, the classic phrase is heat of passion rather than deliberation. Well, then, if my presiding will allow me, one follow-up on his. Yeah. Because, well, I guess you'll get a chance on rebuttal, but whether—and the government can talk about this, too—they talk about a fit of rage. Is the focus not so much on whether he was acting out of rage or grief or whatever emotion there might have been, but whether—is the focus more of whether there was a fit? In other words, you were sort of overpowered— Yes. —by the emotion. Yes. Because that's what I sort of think of this as. You're overpowered by the emotions. You sort of lose control, or as you say, you're not thinking rationally. Yes, yes. But one can act quite rationally even if one's motive is quite emotional, right? Yes. No, I don't dispute that. And that's why, I guess, my question here is what do you do about the going—leaving the scene— Yes. —getting the gun, scoping it out? And then I have to say the one thing that's hardest for me is puts on a ski mask. So it's not just—you would think if the motive is rage— Yes. —the motive is I'm going to get you, I'm going to get you, I'm going to get you. Yeah. But it's I'm going to get you and I'm going to hide my identity. Hiding the identity does not seem consistent with an act that is motivated by rage or revenge. It seems like it's one that's motivated by self-protection. I'm going to kill you and no one's going to catch me. And that's where I think arguably is maybe your hardest point to overcome because, right, that's a rational thing, not consistent with these motives of grief, rage, revenge. Yes. So maybe just— No, of course. No, absolutely. So your argument was that's to scare them. Yes. Because, you know, it's incumbent on the district—the government to prove and the district court to find that Mr. Reyes was acting with malice, not just when he conducted all these preparatory acts, but when he committed the shooting, right? So perhaps he had time to kind of get ready to scare the men, put on a scheme act. But if he—again, and this is all assuming the intent to kill, which we dispute, but say he did intend—say he went down to the block. He was prepared to scare the men. He was prepared to, you know, just maybe even harm them. But in that moment, he decided he was over—when he encountered his brother's killers for the first time, he was so overcome by a fit of—you know, an absolute fit of rage that overcame his emotions, and then he decided to kill rather than harm or scare. At that point, he was—he would not be acting for malice. Thank you very much. As we like to say, we've kept you well past your time, but that's been very helpful. So we'll hear from the government. Mr. Ross. Good morning, Your Honors. May it please the Court. Henry Ross for the United States. I represent the government both in this appeal and in the district court proceedings below. This court should affirm Judge Ridden's application of the attempted first-degree murder guideline. The defendant's argument is premised on the claim that he intentionally refrained from firing a second shot at point-blank range when he had the opportunity to do so. As you know to Judge Nardini, Judge Ridden never made that factual finding. In fact, she found the opposite, which was that the defendant did attempt to fire a second shot at close range. She made that finding after she had resolved the technical issue with the written portion of her opinion. Where was that in the record? That's at page 171 of the appendix, Your Honor. And the specific quote is, after firing, Mr. Ray has stepped closer and attempted to fire a second shot at individual one at point-blank range. However, Your Honors, this court does not need to resolve this issue to resolve this appeal, and that's because Judge Ridden explicitly found on the basis of the first shot alone that there was sufficient evidence to infer an intent to kill. And that was plainly supported by the record. In fact, the defendant fired that first shot at close range at the target's upper body to avenge the killing of his younger brother. That conduct was sufficient to establish intent to kill, and it was certainly not clear error for Judge Ridden to so find. What do you make of counsel's argument that when we are largely relying on things like video evidence that really don't put the district court in a better position than we are institutionally to figure out what's going on in the video, that we should be reviewing de novo? What do you make of that? We strongly disagree with that, Your Honor. There is no video evidence exception to the clear error standard of review. But why not? Why shouldn't there be? If the video says what it is, I mean, the video just shows what it shows. What's the function of deference? Why would we? There's no demeanor of the witness, as they point out. There's no credibility finding that the video is the video. Why functionally should there be any deference to the district court's findings in those circumstances? Your Honor, otherwise the clear error standard of review would lose any meaning whatsoever. If the clearer the evidence was— That's what I'm saying. That's what I'm saying. Why shouldn't there be de novo review? Why shouldn't we take away all meaning from clear error and make a de novo review? I think that's their pitch, right? If there's video evidence, let's just review de novo. And I'm asking why should that not be the rule? Well, Your Honor, I think even in a case like this one where there is fairly straightforward evidence below, there are still, I would say, classic inferences being drawn by a fact finder. There is more than one video angle. There is an interview of the defendant. All of which is available completely to us. Unless there's some distortion that I'm not aware of, we can watch as a panel the same video that the district court judge found. There's no demeanor, as Judge Nardini just mentioned. There's no demeanor issue. There's nothing besides the video. Unless you tell me that there was something else that the district court had access to that we do not on this record. So, Your Honor, I don't disagree that the evidence below is more straightforward than perhaps in the average case. But this court should not determine which standard of review it applies based on the clarity of the evidence below. And it's certainly the case that there would be— Isn't that the whole point of Smith? Isn't that the whole point of the enterprise in the summary judgment context and other contexts? Where effectively we've been told we are empowered and authorized to review different pieces of evidence de novo if it's something like a video and it's undisputed. So, Your Honor, the video, including in this case, is absolutely disputed. There is a factual dispute not only as to the inferences, as Judge Nardini's questions were going to, but also as to the underlying facts themselves. The defendant is disputing that he attempted to fire a second shot. The parties had disputed below whether the video supported that factual finding. And that factual finding that Judge Reardon made watching that video is entitled to clear error review. Now, as I believe came up in questioning with my colleague, if this court were to review that video and find that it was clear error for Judge Reardon to interpret that video the way that she did or make the findings that she did based on the video, then there would be a remedy available to the defendant. But here, the opposite is true. The video strongly supports the government's position. As I believe Judge Kahn noted, the defendant can be seen looking down after pointing the gun at his intended target. He then comes under return fire. He points the gun again. The gun does not fire. And he looks at it again. So that is the type of support that exists for Judge Reardon's determination here. And it was certainly not clear error for her to find that the defendant attempted to fire a second shot. I also want to turn to Reed. So even if this court were to disagree with the government that Judge Reardon found Can I just, before you do that, with respect to the issue of malfunction, how does that square with this finding that he attempted to fire a second shot at point-blank range? So there's no In other words, there was an initial reference to a malfunction, but then that was, that appears to have been withdrawn. So how do you square those two things? Your Honor, there's no inconsistency between Judge Reardon declining to find a malfunction and finding that the defendant attempted to fire a second shot. Judge Reardon did not need to articulate the subsidiary factual findings that she was making, nor did she need to choose from among the different possibilities for why that gun may not have fired. As we note in our brief, a gun malfunction is the most likely cause that prevented the defendant from firing. But there could well have been not enough ammunition in the gun. The defendant could have accidentally reengaged the safety on the gun. There are many reasons why that gun may not have fired when he intended for that gun to fire. And Judge Reardon Was the gun ever collected, that is, taken by law enforcement? No, it was not, Your Honor. The shell casings were recovered from the scene and charged in the indictment. You say the shell casings. How many casings? So there was one shell casing from the single shot the defendant fired. Then there were six shots of returned fire a few seconds later. So I understand the government's position is then the court not going as far as to say, I'm not going to make a finding that the gun malfunctioned. That doesn't preclude the court from noting that he attempted to or finding that he attempted to shoot, as you point out at page 171, after the court makes the reference of, if you're giving warning shots, you fire in the air, not at someone in a car. So your point is that the court could make a finding that it appears to the court that he attempted to shoot a second time but not go as far as to say that the gun malfunctioned because the government never recovered the gun. That's exactly right. That's exactly right, Your Honor. There's no inconsistency there. And even if this court were to disagree with the government and agree with the defendant that there was some confusion in that portion of the opinion, there is no question that Judge Reardon never affirmatively found that the defendant had an opportunity to fire and chose not to do so, that he chose to spare the life of his intended target. There's no support for that in the record. There's nothing in Judge Reardon's opinion that suggests that. And finally, Your Honors, and I won't go into a full discussion of Reed, but even if we were to remove the second shot or the attempted second shot from consideration entirely, the first shot alone under Reed squarely provided a basis for Judge Reardon to draw the inference that she did. The defendant, as in Reed, fired a single shot and pursued his target, and the target then got away. The government actually argued in Reed that there was an attempt by the government by the defendant to fire a second shot. The district court below in Reed was silent on that, which is what the defendant claims happened in this case. And so even accepting the defendant's argument here about what happened in the record below, this case is on all fours with Reed, and the single shot provides a sufficient basis for this court to affirm. And the focus on Reed was more of the motive, the motive for shooting, correct? In the Reed case, the court focused more on the motive or the defendant's motive in that case for the shooting. I do recall some discussion of that. Yes, Your Honor. My recollection of Reed is that there was actually less evidence in the record of what the motive was. In Reed, there was some vaguely defined dispute. An argument. An argument, exactly, Your Honor. Here there was a murder and an admission by the defendant that he committed this shooting to avenge the murder. And so that fact actually makes this case a stronger case for both premeditation and intent to kill. How do you respond to your opponent's argument that at the time he actually confronted who he believed were his brother's shooters, that he at that point was in a fit of rage and had no malice? So, Your Honor, the defendant plainly acted with deliberation here, and Judge Rudin did not commit clear error in so finding. The defendant, as Judge Nardini noted, put on a ski mask. He armed himself. He traveled to the area where someone had told him these people were. He can hardly then claim that he was provoked merely by seeing the exact people that he expected to see when he got there. That argument is absurd. And there's also no confrontation. But maybe I've got the record wrong. I thought what happened was he saw them, and exactly when he put on the ski mask is an open question. Your Honor, he admitted that he went to look at the people that he was told about before committing the shooting. And then when he returns, he's wearing a ski mask that hides his identity. And so it's clear that Let's hypothetically say that he returns, and it's within minutes that he returns. He gets a ski mask, and he returns, and then what occurs on the video occurs. Does that necessarily negate a finding or determination of acting in a fit of rage or in a fit of grief? I think absent additional facts, Your Honor, even those circumstances would still be insufficient to negate malice and premeditation. They're really, in the typical case, a confrontation of some kind, some sort of near-in-time triggering event. It's not just seeing someone that you already expected to see. And the court should keep in mind that there was no prior relationship between the defendant and these individuals. No one was haunting him. Well, that's the point. The point is that these individuals, in his mind, had killed his brother, so he didn't know them, but he could identify them. And with respect to Jishkan, Jishkan, did you have a question? Oh, no, no, please, please. So there is a period of time when Mr. Rez sees these people who he thinks murdered his brother. He puts on a ski mask, and I appreciate that, and he takes one shot. Now, as I understand the argument from Ms. Atkins, in part, is that the district court, in determining whether he was sufficiently provoked, did not consider whether provocation could be rekindled by his seeing these perpetrators again. What's your response to that? Your Honor, absent any indication that there was something triggering about seeing those individuals again, it certainly wasn't necessary for Judge Reardon to spell that out on the record. I think this would be potentially a different case if there had been some sort of confrontation or taunting or mutual acts of violence between the two sides. But this was just an ambush where the defendant ran across the street out of nowhere. So there was absolutely no reason for Judge Reardon to reconsider whether somehow— So let me back up then. If he had not put on the mask, I'm just trying to isolate exactly what you're focused on in connection with this malice finding that necessarily must be made for the enhancement to make sense. If he had not put on the mask, seen the people he thought had killed his brother, and immediately started shooting, would that be enough to negate a finding of malice? I still don't think so, Your Honor, given that he had previously seen those targets a few minutes before. I think there would be fact-intensive questions in a situation like that. If there were evidence of the defendant's demeanor, if there were evidence of other things that might have happened surrounding the shooting, perhaps it would be a closer question. So any lapse of time is enough to negate malice. What are you asking us to determine here? Your Honor, the government is asking the court to determine that Judge Reardon did not commit clear error when she found, based on these facts, that the defendant acted with premeditation. When he knew who he was going to see, there was no exchange of any words between himself and those people, and he had a gun and a ski mask and ambushed them by shooting at them. Our argument is that those facts, under a clear error review standard, clearly support premeditation and malice. If the judge should make the contrary finding, that based on these exact facts, that malice had not been proven by preponderance, in your view, would we similarly be obliged to affirm that there would not be clear error for that finding? Our view of the record, Your Honor, is that it's quite clear that there was premeditation here. No, no, no. Yes or no? I'm asking a hypothetical, right? And it is a hypothetical because the judge ruled your way. What I'm trying to get at is, in this hypothetical world, where based on the same facts, at the end of the day, she had said, I don't find malice proven by preponderance. And let's say there was a hypothetical government appeal of that. We would still be dealing with clear error as the standard of review, correct? That's right, Your Honor. And in your view, would we still be obliged to affirm? Because what I'm trying to get at here is, the whole idea of the clear error standard is that we give a tremendous amount of deference to the district court's factual inferences, right? And you can take the same set of facts and very often make two contrary factual inferences, and they're insulated from our review because our job is not, in the first instance, to figure out, for example, what mens rea is in somebody's head. We're just trying to figure out, was there an adequate factual basis such that a rational jurist, the district court in this case, could draw a particular factual inference? So I'm trying to ask, to come back to my question, hypothetically, had Judge Reardon gone the other way on this, and it was a hypothetical government appeal, would we be obliged, nevertheless, to affirm for clear error, under the clear error standard? I think likely yes, Your Honor. The discretion afforded to the district court in making determinations like this is extremely broad. As this panel previously noted this morning. And so I do think it's possible that this court would be obliged to affirm under that standard. So Judge Swain and Judge Schofield, under what I understand were very similar circumstances, but, you know, every case is very different, made the opposite, arrived at the opposite conclusion with respect to this enhancement. And let's just assume that that were appealed, that those two decisions were appealed, it's likely that that would be, in the government's view, subject to clear error review. And, you know, that's a much harder standard of review for the government to prevail in those cases. Your Honor, it's difficult for me to say what position we would take on clear error review. The Judge Swain opinion that Your Honor mentioned, Mayo, is easily factually distinguishable. I think the defendant there came to help a cousin involved in a street fight wearing slippers, was assaulted during a dispute, and then took his cousin's gun and fired it. So it's a very different fact in that case. And the district court's reasoning is not entirely clear from the record. But it appears that the defendant did not aim at the torso of his targets. The record does make clear the defendant in that case filed multiple shots from six to eight feet away. And if those had been directed at the head or torso of intended victims, it's hard to imagine that the district court would have declined to apply the attempted first-degree murder guideline. That doesn't give me a lot of comfort, but okay. And if it had, Your Honor, I think the government's view would be that that would be clear. Thank you very much. Thank you. Ms. Atkins. Just a few things, Your Honor. I'd like to start with malice. You know, Your Honors have noted the great deference afforded to district courts, assuming, again, this is all reviewed for clear error. But I'd just like to remind this Court that the district court did not really actually make any factual findings grappling with malice under the specific circumstances of this case. All the district court said was, far from acting in the heat of passion, it was a full 11 days between when the defendant's brother was killed and when he proceeded to shoot the men. That does not address the facts. I'm reading page 170. Upon those facts, and she's recited all the facts, I conclude that Mr. Reyes's conduct on March 8, 2023, was, quote, willful, deliberate, malicious, and premeditated. You're not saying that the judge neglected to make a necessary finding, are you? I mean, that precludes a finding of recklessness. When the district court did not address the fact that Mr. Reyes could have been acting from the heat of passion, not just in committing a crime 11 days later, which certainly we don't dispute that 11 days is a sufficient period of time for somebody to cool down, right? So if you're just talking about the provocation of someone's brother being murdered, Mr. Reyes's brother being murdered, we don't dispute that he was not acting from the heat of passion in response to that provocation, right? So in response to his brother being killed. The question is just whether the district court's findings are sufficient or, as a legal matter, or are, in fact, clear error when the district court did not address the second provocation, which would be hearing that his brother's killers were down the block on the one hand, and also then going to that area and seeing his brother's killers for the first time. I thought he saw them first. He saw them. They were near in front of his mother's house or nearby his mother's house. There's some ambiguity. There's some ambiguity in the record. What the district court found, I believe, is that he heard, based on Mr. Reyes's statement to police, that he heard his brother's killers were down the block. At that point, that's when he, you know, that's when he went down. That's when he got his ski mask. But I'd just like to point out again, and also the sheer absence of facts on this record, when it is the government's burden to prove that the defendant acted with malice. The government suggests that Mr. Reyes had, you know, had walked by, had had sufficient time to then cool down. The government suggests that he had sufficient time between when he put on his ski mask and when he confronted the men. We don't know any of that on this record. And I think that goes to show the perils of applying the most serious of an already serious set of guidelines to situations where the facts are utterly unclear. I'm looking at page 145 of the record. Perhaps I read it wrong, but this is his attorney saying Mr. Reyes did candidly admit that he went there to confront these people. He did go up there because he expected them to be there. He had seen them come by his mother's building. So you're saying the lawyer misspoke or misrepresented to the court? Well, the district court ultimately considered that argument and then found, and I can certainly find the page, that he had heard that they were down the block. I'll find that page for Your Honor. Well, go ahead and find that page. Yes. It's page 170. Far from acting in the heat of the moment, it was a full 11 days after his brother's death that Mr. Reyes traveled to the area around East 167th Street and Sherman Avenue after being told the perpetrators were there and after receiving a description of it.  I'm focused on what his own attorney said. Yes. In making the argument to the court is that he had seen them at his mother's  Maybe the attorney misspoke. I mean, I think this Court should be focused on, you know, what the district court actually found, and in part that was based on the undisputed, you know, the video recording interview with police. Can I ask two quick questions? Yes, absolutely. I know you've got a few more points, but just two quick questions. One is a housekeeping question. First, Mr. Ross pointed us to page 171 where the district court found, concluded, determined, however you want to put it, that after firing, Mr. Reyes stepped closer and attempted to fire a second shot at individual one at point blank range. Mr. Reyes then proceeded to chase individual one with the gun, still trained. So that seems to undercut the argument that he did try to shoot. It also seems to not exactly be the argument about a malfunction, but align with an argument that something happened with the gun, but he was trying to shoot, which is consistent with attempting. Yeah. Can you address that? Yes, absolutely. So the record is a bit confusing, but the best reading is that that is a remnant of the district court's prior opinion that it then rescinded. So and I'll walk you through how, yeah, I'll walk you through how that happened. So you can tell by the contrast between pages 169 of the transcript and then page 170 of the transcript that the district court had had a prior version of its opinion that it superseded. And it started over, right? Yeah, yeah. So it starts over on page 170. Yes, exactly. Are you saying stuff after 170, she started over and was backtracking into old stuff again? It seems it's entirely possible. I think that's the back. I mean, if we follow you, if we agree with you, that means everything from page 170 forward is meaning. Well, no. It means that there are some facts that are remnants of the prior district courts. Well, how are we supposed to know that? Well, so I think if this Court believes there's any ambiguity, I think a Jacobs exit remand would be perfectly appropriate.  Yeah, how do we know that? But how do you argue that once she started and said, no, no, I'm out, restart, I'm going forward, no indication of any hiccups afterwards. Are we supposed to just pick any factual finding that's detrimental to the defendant and say, well, maybe she didn't mean that? Any factual finding favorable to the defendant, yeah, we'll keep that one? No, no. Or we're literally going to close the whole thing out? Yeah, and I want to say I understand Your Honor's concern. I want to say that I'm laser-focused on this one fact because it is part and parcel of a fact that the district court specifically declined to add in its new version of the opinion. Where is the new version? Just explain. Yeah. Just explain this to me. Yeah. Where is this new version? Yeah. So, I mean, it starts on page 170, and there the district court specifically so originally on page 169, the district court found after missing individual one, Mr. Reyes then approached him to shoot from approximately a car-width away. Mr. Reyes' gun did not fire, allowing the individual to escape. Now, the district court doesn't say the gun malfunctioned, the district court but the district court clearly is intending to say in its prior version that Mr. Reyes in fact attempted to shoot again and he could not shoot again for whatever reason. So does this mean then, you pointed us to 169, the earlier version. Yes. Should we disregard that the court said the video recordings reflect that Mr. Reyes walked by and scoped out his intended victims before the shooting? They further reflect that he had armed himself and wore a ski mask over his face to conceal his identity. He then returned to the area of East 167th Street and Sherman Avenue and began running toward the group. As the group scattered, he raised his gun and fired at an individual whom I refer to as individual one, wearing an orange jacket as that individual dove for cover behind the blue sedan parked a few feet away from where Mr. Reyes stood. So when the court says he scoped out the area, left, and then returned, should we ignore that or is that a fact that we can rely on?  Well, when the district court picks back up, the district court repeats that fact about, again, scoping out his intended victims, which I'd like to clear that. Isn't that consistent with seeing them at page 145 when counsel said he had seen them? What that's referring to is not – Because when I asked you about page 145, you said the court didn't make that finding. But it certainly sounds like the court made that finding at 169. I think that's referring to whether or not he saw the men at his mother's apartment building. What the district court – and that was what counsel was referring to when she said he saw the men. What the district court found is that Mr. Reyes had heard the men were there. Then, as he admitted in his videotape recording to police, an interview that he showed that he willingly presented himself for, he admitted that he had walked by the men first before committing the shooting. We don't know how quickly. We have no facts in the record to show when that occurred, how long the period of time was, whether he had had sufficient time to cool down for the purposes of a malice finding. And, Your Honors, I mean, I understand that the record is, you know, a bit of a mess because of the redacted – you know, because the district court went back. I'd just like to point out that if this court – oh, sorry. It's not that much of a mess. It's pretty clear. She repeats the same paragraph on 168, 160, 170. So you can see exactly where she picks up. So it seems to me that she's going forward.  It's perfect. Everything from 170 forward. Right. Well, she specifically – she specifically omits what she had said on page 169, was that the gun did not fire. Yeah. Let's just assume everything from 170 forward is her finding. That includes the portion that Judge Loyer referenced on 171 that the government referenced. Mr. Reyes stepped closer and attempted to fire a second shot.  So, again – She didn't misspeak on that. She didn't say, oh, wait a minute. Didn't mean to say that. She said it. So if the – if this Court is applying de novo review, of course, it doesn't matter what the district court found. This Court can draw its own conclusions about the video. And that, of course, does not – you know, does not say anything about malice or Mr. Reyes's time to deliberate and not act from a fit of – a fit of rage. So one – just before you end, one more quick housekeeping matter. You do make a challenge on 922G. And just as a housekeeping matter, understanding that you preserved this – the argument, you – would you acknowledge that this is foreclosed by Zerka? Yes, I do. We're preserving it for further review. Thank you very much. Thank you. Very well argued on both sides. We'll reserve the decision. Thank you both. Thank you.